UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 11-51502 |
| | ) | |
| 1555 Wabash LLC, | ) | Chapter 11 |
| an Illinois Limited Liability Company, | ) | Hon. Jacqueline P. Cox |

**Memorandum Opinion on Claim Objection (dkt. no. 141)**

This matter is before the Court on the objection of AmT CADC Venture, LLC, (the "Lender") successor in interest to AmTrust Bank ("AmTrust"), to Claim No. 3 of Evans Construction Company ("Evans"). For reasons noted herein, the Objection to Claim No. 3 is Sustained in Part and Overruled in Part.

**I. Jurisdiction**

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334(a). This matter involves the adjudication of a claim objection, which is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

**II. Facts and Background**

On December 27, 2011 (the "Petition Date"), 1555 Wabash LLC (the "Debtor"), the debtor herein, filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Code"). (Bankruptcy Case No. 11-51502, dkt. no. 1.)

The Debtor is an Illinois limited liability company which owns a fourteen story mixed-use building located at 1555 South Wabash Avenue, in Chicago, Illinois (the "Property")[1]. (*See*

---

[1] In July, 2007, Ohio Savings Bank, later known as AmTrust Bank made a $46,200,000 construction loan (the "Loan") to the Debtor for the development of the Property. After the Federal Deposit Insurance Corporation ("FDIC") was appointed Receiver for AmTrust, the FDIC transferred AmTrust's rights, title and interest in and to the Loan to the Lender, effective July 21,

Debtor's First Amended Disclosure Statement, p. 12, dkt. no. 102.)  The Property was originally developed by the Debtor as condominium units to be sold at designated sale prices to qualified buyers.  The construction of the Property was generally complete as of the middle of 2009.  At the start of construction, the Debtor had 100 contracts for the sale of residential condominium units at the Property.  However, only 36 of the 100 sale contracts actually closed.  As of the Petition Date, the Debtor was leasing 115 of the remaining 140 residential units to qualified tenants.  (*See* Debtor's First Amended Disclosure Statement, dkt. no.102, p. 13.)

Prior to the Petition Date, Evans Construction Services, LLC ("Evans") entered into a Subcontract Agreement ("Subcontract") with New West Realty Development Corp ("New West" or the "General Contractor"), the General Contractor, to perform structural concrete work for the construction of the Property.  (Evans Exhibit 2, Subcontractor Agreement.)  Evans subsequently entered into a second-tier subcontract with Millennium Concrete Construction ("Millennium"), which was the "labor-placing" subcontractor, responsible for pouring, framing and finishing the concrete.  (Transcript Vol. I, 20, April 18, 2013 ("Tr. Vol. I"); Transcript Vol. II, 258, 283-84, April 23, 2013 ("Tr. Vol. II"); Evans Exhibit 4, Millennium Concrete Subcontract Agreement.)  The original amount of Evans' Subcontract was $9,500,000.  (Evans Exhibit 2, EC 00034.)  The adjusted amount of Evans' Subcontract after approved change orders was $10,061,387. (Evans Exhibit 30.)

Evans claims that following the completion of its work, New West and the Debtor failed to pay Evans the balance of $398,937 due under the Subcontract.  (Evans Response to Objection to Claim, p. 1, dkt. no. 150.)  Thereafter, on January 28, 2009, Evans recorded with the Cook County Recorder of Deeds a Subcontractor's Notice and Claim for Mechanics Lien against the Property.  (dkt. no. 126, Exhibit B.)

---

2010. (dkt. no. 61, p. 1, n. 1.)

On October 16, 2012, Evans filed a secured claim herein in the amount of $398,937 (the "Disputed Claim"), the amount it claims was due to its subcontractors for construction services. (*See* Proof of Claim No. 3.)

On November 26, 2012, Evans filed an objection to confirmation of the Debtor's First Amended Plan of Liquidation (the "Plan"), due to the Plan's treatment of Evans' mechanics lien. (dkt. no. 126.) On December 12, 2012, the Court entered Findings of Fact, Conclusions of Law, and an Order pursuant to 11 U.S.C. § 1129 and Rule 3020 of the Federal Rules of Bankruptcy Procedure, confirming the Debtor's First Amended Plan of Liquidation (the "Confirmation Order"). (dkt. no. 137.) The Court confirmed the Plan and dealt with Evans' objection by requiring the Lender to deposit $500,000 into a Title Escrow Account. The Confirmation Order gave Evans a perfected first priority lien over those account proceeds to the extent of the allowed amount of the Evans claim. (*See* Confirmation Order, dkt. no. 137, p. 5.)

The Plan provided for the irrevocable sale and transfer of the Property and all other assets of the Debtor's estate to the Lender. Accordingly, title to the Property was conveyed to the Lender. Section II (H)(c) of the Confirmation Order authorized the Lender to implement the terms of the Plan, including filing objections to claims. (dkt no. 137, p. 13.)

On December 18, 2012, the Lender filed an objection to the Disputed Claim (the "Objection") pursuant to section 502(b) of the Code. (dkt. no. 141.) Therein, the Lender asserts a setoff for defective construction work Evans performed on the Property. In addition, the Lender contends that the Disputed Claim should be reduced by the amount of direct payments made by the Debtor to Evans' subcontractors and material suppliers and that Evans improperly seeks attorney's fees, which cannot be assessed against the Lender under the Illinois Mechanics Lien Act.

## III. Discussion

As a threshhold matter, Evans argues that the Lender's Objection arising out of subcontract work performed on the Property is barred by the res judicata effect of the Confirmation Order. In particular, Evans points to Section 7.4 of the Confirmed Plan which provides in relevant part:

> "The Debtor shall not pursue any preference, fraudulent conveyance or other litigation after the Confirmation Date, and all claims and causes of action of the Debtor's Estate under Chapter 5 of the Bankruptcy Code shall be waived and irrevocably released on the Effective Date."

(dkt. no. 137, Plan at §7.4).

The Court rejects the res judicata argument, as the Confirmation Order expressly gives the Lender the right to file claim objections. (*See* ¶¶ (B)(b)(4) and H(c) of the Confirmation Order, dkt. no. 137.) The Lender is not pursuing a claim, it is objecting to a claim. The Confirmation Order contemplates a claims allowance process, as evidenced by the $500,000 escrow carve-out provided for in the Confirmation Order. (dkt. no. 137, p. 5.) The Court will rule on the merits of the Lender's Objection; this issue has not been eliminated pursuant to a res judicata theory.

Section 502 of the Code provides in pertinent part, as follows:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under Chapter 7 of this title, objects.

(b) If such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the

extent that–

> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

11 U.S.C. §§ 502(a) and 502(b)(1).

A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bank. P. 3001(f). The claimant must allege facts that, if true, would support a finding that the debtor is legally liable to the claimant. *In re Grocerland Co-Op., Inc.*, 32 B.R. 427, 436 (Bankr. N.D. Ill. 1983). "The burden is on the objecting party to rebut the prima facie allowability of the claim." *In re O'Malley*, 252 B.R. 451, 455-56 (Bankr. N.D. Ill. 1999); *See also In re Carlson*, 126 F.3d 915, 921-22 (7th Cir. 1997). Once such evidence is produced, the burden then shifts back to the claimant to establish, by a preponderance of the evidence, that the claim in fact is allowable. *Id.* Despite the shifting burden during the claim objection process, the ultimate burden of persuasion is always on the claimant to prove the claimed entitlement. *In re O'Malley*, 252 B.R. at 456. After an objection is made, the court must determine the amount of the claim. 11 U.S.C. § 502(b).

### A.  Setoff due to Alleged Defective Construction

The Lender, as the Debtor's successor pursuant to the transfer provided for in the Plan, states in its Objection that it is entitled to a setoff for the funds paid to remediate Evans' defective work at the Property. Illinois law provides that an owner defending against a mechanics lien claim is entitled to a setoff for costs to repair a mechanics lien claimaint's defective work. *Downes Swimming Pool, Inc. v. North Shore Nat'l Bank*, 124 Ill. App. 3d 457, 465-66 (1st Dist. 1984); *See also Mani Elec. Contractors v. Kioutas*, 243 Ill. App. 3d 662, 669-70 (1st Dist. 1993) (affirming an order allowing an owner a setoff for the costs to correct and complete defective work).

On November 26, 2012, the Debtor filed a Second Amended Complaint for General Settlement and Interpleader Pursuant to 770 ILCS 60/30 and 735 ILCS 5/2-409 in a state court foreclosure action. (dkt. no. 126, Exhibit C.) Therein, the Debtor alleged that "[E]vans abandoned the job leaving substantial portions of the work incomplete and having in some cases performed defective work which had to be completed by another contractor." (dkt. no. 126, Exhibit C, p. 4, ¶ 10.)

Here, the Lender claims that Evans and or its subcontractor, Millennium, failed to complete the work within the scope of Evans' contract with the general contractor, and improperly performed certain work. In particular, Lender alleges, in part, that Evans and/or Millennium:

> Failed to install forms, pour concrete and perform its work in a manner that permitted the curtain wall/window system to be installed properly or to a uniform window height. Millennium was aware of this defective work and had began remedial measures to correct it, which required cutting channels into the concrete to allow for the installation of windows . . .
>
> Failed to install forms, pour concrete and perform its work such that floors in the building were level and appropriately sloped. Particularly, the pitch of the floors was outside of appropriate tolerances and the pitch of the floors was inconsistent to such a degree that interior flooring materials could not be installed in the units;
>
> Failed to install forms, pour concrete and perform its work such that the concrete was installed with a smoothness of finish as was called for in the contract documents. Particularly, the concrete had depressions, honeycombing, and other imperfections that needed to be grinded and patched;
>
> Improperly installed the elevator shaft such that it was – at higher floors in the building – at least 2 inches out of plumb . . .
>
> Failed to complete the parapet walls at the entry and on the third and fifteenth floors.

(dkt. no. 174, Evans' Reply at p. 9.)

Because of the work alleged to be defective and incomplete, the Lender asserts it is entitled to a setoff of $441,030, the amount paid to Vixen Construction, Inc. ("Vixen") to repair Evans' defective work. The Court, having considered the evidence and arguments presented herein, finds that the Lender's assertion that Evans produced faulty work is not supported by the evidence.

The Court heard the testimony of James Sanavaitis ("Sanavaitis"), formerly of New West Realty Group, the General Contractor on the 1555 S. Wabash project (the "Project"). Sanavaitis negotiated the Subcontract Agreement with Evans, managed the overall construction of the Project and reviewed the day-to-day operations. (Tr. Vol. I, 18, 89.) Sanavaitis, who is not an architect and does not have a professional license, testified that in 2007, New West began having difficulties with Evans' performance on the Project. Among the deficiencies he observed were unleveled window sills, elevator shafts that were "out of plumb," dips in the floors throughout the site, and problems with "honey combing," a term used to describe an unsmooth concrete surface caused by trapped air. Sanavaitis stated that both Evans and Millennium were notified of the problems. His testimony in this regard was undermined, however, by other evidence suggesting that New West was pleased with Evans' work. In November of 2007, New West communicated its satisfaction with Evans' work in a letter stating that "Evans Construction has done a great job . . . is on time and on budget." (Evans Exhibit 7, November 28, 2007 Letter.) Further, on September 25, 2008, Evans was issued a "Certificate of Substantial Completion" (the "Certificate") with an attached "punch list," a list of items that were incomplete. (Tr. Vol. I, 26.) By issuing the Certificate, the Project architect certifies that the work is 90-95% complete, "with a minor amount of work to complete his contract." (Tr. Vol. I, 27-28.) "Substantial Completion" is defined in the Certificate as follows:

> The Work performed under this Contract has been reviewed and found, to the Architect's best knowledge, information and belief, to be substantially complete.

> Substantial Completion is the state in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the Work for its intended use. The date of Substantial Completion of the Project or portion thereof designated above is hereby established as 9/25/08 [sic] which is also the date of commencement of applicable warranties required by the Contract Documents, except as stated below.

(Evans Exhibit 11, Certificate of Substantial Completion.) Sanavaitis admitted that he approved the issuance of the Certificate. (Tr. Vol. I, 115.)

After the Certificate was issued, the Lender claims that Evans abandoned the job without fully completing the work identified on the punch list. Sanavaitis testified that both Evans and Millennium were issued a written request to return to complete the Project. (Tr. Vol. 1, 41.) After receiving no response, New West terminated the Subcontract on November 12, 2008. (Lender Exhibit 8, Notice of Termination.)

Given the deficiencies complained of, the Court questions why the only correspondence detailing the subcontractors' alleged incomplete work is an August 20, 2010 letter, issued nearly two years after the Certificate of Substantial Completion was issued, and after the State Court Mechanics Lien action was filed. Therein, New West states that Vixen had to complete the concrete work for the Property "due to [Millennium Construction's] failure to complete their contracted scope of work." The letter, however, does not complain about Evans' work. (Tr. Vol. I, 146-48; Lender Exhibit 23.) The Court finds it worth noting that within that same letter, New West's Senior Project Manager wrote that it incurred "no deficiencies" with a number of Evans' subcontractors, namely Forming Concepts, the concrete form supplier for the elevator shafts, which Sanavaits testified were "out of plumb, and [a]skew." (Lender Exhibit 23; Tr. Vol. I, 154.) The Lender's insistence that Evans' work was deficient is further undermined by Sanavaitis' testimony that despite his apparent dissatisfaction with their work on the Project, he approved

-8-

each of Evans' payments throughout the Project. (Tr. Vol. I, at 220-21.) Indeed, the evidence reveals that except for the sum of $398,000, Evans' Subcontract (valued at $10,061,387) was paid in full. (Tr. Vol. 1, 221; Evans Exhibit 1, EC 00092.)

The Court also heard the testimony of Evans Spileos ("Spileos") of Evans Construction Consulting, a civil engineer with over 40 years of experience in the construction industry. He testified credibly that Evans returned to the site to correct any defects that were Evans' responsibility under the Subcontract. (Tr. Vol. II, 324-25.) According to Spileos, many of the defects complained of were outside the scope of Evans' Subcontract with New West or were specifically excluded from the Subcontract because they were too labor-intensive, or too expensive. (Tr. Vol. II, 277, 325-26.) He also testified that the "honey combing" that developed on the concrete surface is commonplace given the "Class C" concrete finish called for in the Subcontract. (Tr. Vol. II, 320-22.) Spileos testified that any imperfections that were not up to standard for a "Class C" finish, were repaired. (Tr. Vol. II, 324.) The Court notes that while the parties' Subcontract calls for a "Class C" finish for all surfaces, the architect's specifications called for "Class A," or smooth tolerances for concrete surfaces exposed to view. This discrepancy undoubtedly contributed to the parties' differing expectations as to an acceptable concrete finish. (Evans Exhibit 2, Subcontract Agreement, EC 00040; Evans Exhibit 5, Section 3.2, Architect's Concrete Finish Specifications; Tr. Vol. II, 269-70.) Spileos claims that Evans left the job in late October, 2008, after having completed all work due under the Subcontract, with the caveat that it was unable to construct certain "parapet walls" due to the location of hoist machinery blocking Evans' access. (Tr. Vol. II, 335.)

In the Court's view, many of the alleged imperfections were the result of the Debtor's attempt to cut costs when negotiating the Subcontract. The Court declines to compensate the Lender for these purported defects when the evidence shows that the finishes involved were explicitly contracted for by New West. The Court will, however, allow the Lender a credit of $40,000 for the cost to construct the parapet walls. (Lender Exhibit 9, p. EC 5015; Tr. Vol. I, 210.) The Court notes that although Spileos disputed the amount incurred to construct the

parapet walls, no evidence was presented by Evans to support the assertion that they could have been constructed for a lesser amount. (Tr. Vol. II, 335-37, 445.) Accordingly, a credit in the amount of $40,000 will be allowed the Lender.

### B. Setoff for Payments Made Directly to Subcontractors

The Lender argues that it is entitled to a setoff reflecting the amounts owed Evans' subcontractors that have already been paid directly by the Debtor. Evans agrees that the Lender is entitled to a setoff for payments made to certain subcontractors, while contesting payments made to other subcontractors, either in part or in full.

The chart below summarizes the parties' differing views as to amounts attributable to the subcontractors on the Project:

| Analysis of Claim No. 3 per Lender | | Analysis of Claim No. 3 per Evans | |
|---|---|---|---|
| Claim Amount | $398,937.00 | Claim Amount | $398,937.00 |
| J&B Steel | $(52,990.19) | J&B Steel | $(52,990.19) |
| J&B Steel | $(70,209.00) | J&B Steel | $(70,209.00) |
| Twin City | $(28,500.00) | Twin City | $(28,500.00) |
| Morrow Crane | $(9,077.00) | Morrow Crane | $(9,077.00) |
| Gerdeau | $(15,000.00) | Gerdeau | $(15,000.00) |
| Ozinga | **$(93,245.53)** | Ozinga | **$(39,107.00)** |
| Stevenson Crane | **$(23,483.00)** | Stevenson Crane | **$0** |
| Patent | $(51,034.50) | Patent | $(51,034.50) |
| Forming Concepts | **$(18,000.00)** | Forming Concepts | **$(13,737.00)** |
| | $ 37, 397.78 | | $119,282.31 |

The parties' disagreement centers on the amount of direct payments made to Ozinga

-10-

Chicago RMC, Evans' concrete supplier; Forming Concepts, the concrete form supplier, and whether the Lender is entitled to a setoff for the payment made to Stevenson Crane.

**Stevenson Crane**

Both sides acknowledge that Stevenson Crane was on site during the Project providing services. However, Evans denies the assertion that Stevenson Crane was employed as its concrete subcontractor on the Project. The Lender elicited the testimony of Sanavaitis, who stated that he observed Stevenson Crane workers on the Project site and that he authorized a payment of $23,483.00 to Stevenson Crane via Greater Illinois Title Company. (Tr. Vol. I, 75.) He admitted, however, that he never saw a subcontract agreement between Stevenson Crane and Evans or Millennium (Tr. Vol. I, 184) and that he did not know who hired Stevenson Crane. (Tr. Vol. I, 185.) The only written evidence offered by the Lender in support of its position was a notarized final payment waiver, signed by the owner of Stevenson Crane, which states that "[t]he undersigned has been employed by Millennium Construction to furnish crane and rental operations for the premises known as 1555 South Wabash LLC." (Lender Exhibit 12.) Quite tellingly, however, no contract was produced which would be the best evidence of a subcontractor relationship between Stevenson Crane and Evans or between Stevenson Crane and Millenium.

Spileos, of Evans Construction, testified credibly that Stevenson Crane was not a subcontractor of Evans or Millennium, and that Millennium, a labor subcontractor, did not have authority to hire Stevenson. (Tr. Vol II, 358, 405.) He also testified that to his knowledge, the only crane company hired by Evans was Twin City Steel Erectors; this testimony is supported by the evidence. (Tr. Vol. II, 259, 357; Evans Exhibit 30, NWC-E 001038.) The Lender's speculation that Stevenson Crane *might* have been Evans' subcontractor on the job is insufficient to satisfy its evidentiary burden. In the absence of any evidence, the Court declines to allow the Lender a credit based solely on the fact that payments were made to Stevenson Crane in the disputed amount of $23,483. The Court is further convinced by the fact that Stevenson Crane did not record a mechanics lien against the Property, and it was not listed among Evans' 17

subcontractors in its Final Pay Application (Evans Exhibit 30, NWC-E 001038; Tr. Vol. I, 185.) The weight of the evidence presented herein leads the Court to conclude that the Lender is not entitled to a setoff for payments made to Stevenson Crane.

### Ozinga Chicago RMC, Inc.

The Lender also claims that it is entitled to a setoff from the Disputed Claim in the amount of $93,245.53, which reflects the amount of the Debtor's payment to Ozinga Chicago RMC, Inc. ("Ozinga"), in settlement of Ozinga's lien in the amount of $155,409.23.

Evans responds that the amount paid by the Debtor exceeds the $39,107.00 it attributes to Ozinga in its Sworn Statement (Evans Exhibit 1, Ex. C, Sworn Statement, EC 00092.) Evans therefore presumes that Ozinga must have included amounts for materials that were not approved by Evans, or delivered outside of the scope of Evans' subcontract with Ozinga. (Evans' Response, p. 8, dkt. no. 150.) For that reason, Evans submits that the Lender is not entitled to a setoff of $93,245.53. (*Id.*)

In its brief, the Lender contends that the Court should allow it a setoff in the full amount of its settlement, noting that the $155,409.23 amount originally asserted by Ozinga is nearly four times the amount that Evans claims it owed Ozinga. However, the Court saw little evidence substantiating the Lender's assertion that Ozinga was entitled to the amount of its asserted lien. The evidence supports Evans' suspicion that Ozinga may have overstated what it was owed.

Ozinga served as the concrete supplier to Evans, Vixen and Prairie Material. According to Vixen's Final Lien Waiver, Ozinga provided $10,000 worth of concrete to lay concrete for nearly 3,000 square feet of space. (Tr. Vol. I, 192; Evans Exhibit 29.) However, when Sanavaitis was asked whether the $10,000 figure was accurate given the scope of work performed, he admitted that he "probably misstated" that amount. (Tr. Vol. 1, 195.) Indeed, his testimony reveals that Vixen's contract with Ozinga was for substantially more than $10,000. (Tr. Vol. I, 192.) Sanavaitis was unable to answer whether Ozinga supplied Vixen more than the $10,000 worth of concrete that was attributed to them in the Final Lien Waiver. (Tr. Vol. I, 195.)

In support of its burden, the Lender hangs its hat on the fact that Ozinga asserted a mechanics lien against the Property in the amount of $159,000, the basis for which is several unsigned delivery invoices. (Evans Exhibit 23.) According to Spileos' unrebutted testimony, however, it was Evans' standard practice to have delivery tickets signed to verify that the correct materials were delivered and to keep track of the various subcontractors' accounts. (Tr. Vol. II, 370.) Indeed, each of the invoices attached to Evans' Final Payment Application are signed. (Evans Exhibit 30.) The Court accords little weight to Ozinga's unsigned invoices, which were curiously dated after Evans was finished pouring concrete on the job and were not included in Evans' Final Payment Application. (Evans Exhibit 23, Tr. Vol. II, 327, 369-70.) The Court notes that no representative from Ozinga testified regarding the work it performed.

Accordingly, the Court will allow the Lender a setoff of only $39,107.00, the amount Evans stated it owed Ozinga in the Final Payment Application.

**Forming Concepts**

The Lender also claims it is entitled to a setoff in the amount of $18,000, which reflects the amount paid to Forming Concept in settlement of its lien of $63,000. Evans is willing to stipulate only to $13,737, the amount reflected in its Final Payment Application. (Evans Exhibit 12, p. EC 00091; Tr. Vol. II, 479.) The only evidence submitted by the Lender in support of its claim was proof of its settlement with Forming Concepts in the amount of $18,000. Again, without any evidentiary support for the asserted lien, the Court declines to allow the Lender to setoff an amount above $13,737, the amount reflected in Evans' Final Payment Application.

C.    **Recovery of $115,000 Pledge Money Funds**

The Lender also objects to Evans' attempt to collect payment of $115,000, the balance of funds escrowed as a condition precedent to funding Evans' concrete operation. During its opening remarks at the hearing on the Objection, Evans asserted for the first time that it is

entitled to the return of $115,000 it claims is due pursuant to a certain Account Pledge Agreement ("Pledge Agreement"). Under the Pledge Agreement, entered into by Evans, AmTrust and the Debtor subsequent to the execution of the Subcontract, AmTrust required that a percentage of each draw be held back and deposited into a separate bank account, not to be released until Evans achieved "substantial completion" of the Project. (Evans Exhibit 8, Account Pledge Agreement; Tr. Vol. II, 249-50, 294.) According to Evans, after the issuance of the Certificate of Substantial Completion the funds should have been released.

Evans filed a secured claim in the amount of $398,937.00, the basis for which, according to section 2 of the Claim, is its "Mechanics Lien." (Evans Exhibit 1, Proof of Claim No. 3.) According to the Sworn Statement for Contractor and Subcontractor attached to the Proof of Claim, the $398,937 represents amounts that were owed directly to Evans' subcontractors. (Evans Exhibit 1, p. EC 00092.).

Although not raised by Evans, the Court notes that a late filed amended claim may relate back to the date of the original proof of claim "if the claims in the amendment arise from the same conduct, transaction, or occurrence, as required under Rule 15 of the Federal Rules of Civil Procedure." *In re Xechem Int'l*, 424 B.R. 836, 841 (Bankr. N.D. Ill. 2010); *In re Stavriotis*, 977 F.2d 1202, 1204 (7th Cir. 1992). Pursuant to Federal Rule of Bankruptcy Procedure 9014[2], the court may extend Rule 15 to proofs of claim after providing notice to the parties and a reasonable opportunity to comply. *In re Xechem*, 424 B.R. at 841. "The purpose of permitting amendments to pleadings is to 'enable a party to assert matters that were overlooked or were unknown to him at the time he interposed his original complaint or answer.'" *In re Stavriotis*, 977 F.2d at 1206, (quoting Wright, Miller and Kane, *Federal Practice and Procedure*, § 1473 (1971)). "However,

---

[2]Federal Rule of Bankruptcy Procedure 9014 states, in relevant part:

> (a) Motion. In a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought. No response is required under this rule unless the court directs otherwise.

bankruptcy courts are not required to permit late amendments which are primarily used as a back-door route to secure bar-date extensions." *Id.*

The record in these proceedings reflects that Evans was aware of its right to these funds as early as August 25, 2008, the date on which it contends it was entitled to receive the balance of the funds in the Pledge Account. Pursuant to the Order Setting Bar Date entered in this case, creditors had until October 31, 2012 to timely file pre-petition claims. (dkt. no. 96.) To date, more than 7 months since the Claims Bar Date, no request has been made by Evans for an amendment to reflect an unsecured claim for the $115,000 Pledge Account funds. The Court finds that it would be prejudicial to allow Evans to assert its right to these funds at this time because it failed to raise the claim in any of its pleadings relative to this Objection.

### D. Recovery for Attorneys' Fees Under the Mechanics Lien Act

The Lender objects to Evans' claim for $67,453.19 in attorney's fees it asserts it is entitled to under 770 ILCS section 60/17(b) of the Illinois Mechanics Lien Act ("IMLA").
That section provides, in relevant part, as follows:
If the court specifically finds that the owner who contracted to have the improvements made failed to pay any lien claimant the full contract price, including extras, without just cause or right, the court may tax that owner, but not any other party, the reasonable attorney's fees of the lien claimant who had perfected and proven his or her claim.

Evans claims that it is entitled to attorneys' fees, arguing that because the Confirmation Order gives the Lender the right to file claims, it "stands in the shoes of the Debtor and not in its capacity as a subsequent purchaser." (dkt. no. 150, p. 9.) However, courts that have opined on this issue agree that the language of the statute is unambiguous; only the owner *who contracted to have the improvements made*, "not any other party," may be liable for attorney's fees. *See VanBebber v. Wilkerson (In re Wilkerson)*, No. 07-72213, 2010 WL 432252, at *3 (Bankr. C.D. Ill. Feb. 1, 2010) (Emphasis added); *Action Plumbing Co. v. Bendowski*, 402 Ill. App. 3d 681, 685-88 (2d Dist. 2010). It was New West Realty Group Construction, LLC on behalf of the

owner, that contracted for the improvements to the Property, not the Lender. Accordingly, the Court determines that Evans is not entitled to attorneys's fees from the Lender as part of the Disputed Claim.

## IV.    Conclusion

For the reasons noted herein, the Court sustains Lender's objection in part and will allow Evans' Disputed Claim in the reduced amount of $79,282.31 which reflects the amount of the originally filed proof of claim of $398, 937, less payments made directly to Evans' subcontractors ($279,654.69), and the cost to construct the parapet walls ($40,000).

This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. A separate Order will be issued consistent with this opinion.

Dated: June 19, 2013                    ENTER:

*Jacqueline P. Cox*
J.P.Cox
_____
Jacqueline P. Cox
U.S. Bankruptcy Judge